**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **JULIANN P. PARIS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:12-CV-00596** |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Juliann P. Paris ("Paris") filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Specifically, Paris alleges that that the ALJ erred in evaluating the severity of her mental impairments, by not finding that her mental impairments met the criteria under the listings, and by inadequately considering the extent of her physical impairments.

This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed all issues and the case is now ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, and the applicable law. I conclude that substantial evidence supports the ALJ's decision on all grounds. As such, I **RECOMMEND DENYING** Paris' Motion for Summary Judgment (Dkt. No. 10), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 12.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to determining whether substantial evidence exists to support the Commissioner's conclusion that Paris failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Paris bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate a disability claim. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals

the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460-462 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Paris was born on June 23, 1959 (Administrative Record, hereinafter "R." at 224), and is considered "person closely approaching advanced age" under the Act. 20 C.F.R. § 404.1563(d). Paris is insured through June 30, 2014 (R. 16); therefore she must show that her disability began before the end of her insurance period, and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Paris is a high school graduate and had a year of nursing training. R. 34–35, 191. Paris has worked in the past as a waitress, a nursing assistant, and most recently as a medical unit clerk. R. 63, 194. Paris' work as a medical unit clerk was classified as light, semiskilled work. R. 63. Paris reported on her disability application that during the relevant period, she was capable of taking care of her dogs, cleaning, doing laundry, riding a lawnmower, driving, going shopping, reading, and going to doctor's appointments. R. 206–210.

## Claim History

Paris protectively filed for DIB on December 4, 2008 claiming that her disability began on November 5, 2008. R. 181. The state agency denied Paris' application at the initial and reconsideration levels of administrative review. R. 102–106, 112–18. On May 17, 2011, ALJ Steven DeMonbreum, held a hearing to consider Paris' disability claim. R. 29. Paris was represented by attorney Gary C. Hancock at the hearing, which included testimony from Paris, her husband, and vocational expert Mark Hileman. R. 31.

On June 3, 2011, the ALJ entered his decision denying Paris' claims. R. 14–24. The ALJ found that Paris suffered from severe impairments of major depressive disorder, unspecified anxiety disorder, unspecified personality disorder, unspecified mood disorder, Sjögren's syndrome, obesity, myofascial pain syndrome/fibromyalgia, and hypothyroidism. R. 16. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 17. The ALJ further found that Paris retained the residual functional capacity ("RFC") to perform medium work, and that Paris was able to meet the basic mental demands of unskilled work "but is unable to work with the public or in crowds and is unable to perform jobs that involve more than superficial/occasional interaction with co-workers and supervisors as such situations cause stress to the claimant." R. 18. The ALJ determined that Paris could not return to her past work as a medical unit clerk, nurse's aide, and waitress (R. 22) but that she could work at jobs that exist in significant numbers in the national economy: namely laundry worker, hand packer, mail clerk, and marker. R. 23. On October 10, 2012 the Appeals Council denied Paris' request for review (R. 1–3) and this appeal followed.

<u>**ANALYSIS**</u>

<u>**Mental Impairments**</u>

With regard to Paris' mental impairments, Paris alleges that the ALJ erred in two respects. First, Paris argues that the ALJ's analysis and determination of the severity of her mental impairments was incorrect. Second, Paris contends that the ALJ erred in finding that Paris did not meet or medically equal the requirements of Listings 12.04 (affective disorders) or 12.08 (personality disorders). For the reasons that follow, I find that substantial evidence supports the ALJ's decision on both grounds.

## I.    *Medical Evidence*

The evidence shows that Paris had sporadic treatment for her depression from mental health specialists during the relevant period, with hospitalizations during severe episodes. Paris saw a primary care physician, Leslie Badillo, M.D., numerous times following Paris' alleged onset date of disability. R. 317–18, 331–36, 483–94, 501–09. At these visits Paris reported symptoms of depression, and Dr. Badillo's course of treatment was limited to management of the symptoms through medication. Treatment notes from Paris' visits to Dr. Badillo shed little light on any work limitations Paris might have had, although in December 2008 she stated that Paris was "probably a reasonable candidate for total disability." R. 318. Dr. Badillo did note that Paris' depression appeared stable in September 2010 (R. 493) and that Paris had a normal mood and affect at a visit in November 2010. R. 501.

Paris was hospitalized for a week in November 2008 after reporting depression and suicidal ideations after her boss sent a letter regarding her job performance. R. 290–98. Upon initial evaluation Paris was assessed a Global Assessment of Functioning ("GAF") of 30. R. 293. When admitted, providers resumed and adjusted Paris' medications. After being compliant with

medications and participating in group counseling, Paris reported improvement in symptoms and was discharged with a GAF of 60 and a "good" prognosis after a seven day admission. R. 290– 91.

Paris sought treatment from psychiatrist Thomas Rowell, M.D. in early January 2009 for symptoms of depression and anxiety. R. 362–64. At her initial visit, Paris reported poor energy, poor sleep, and difficulty getting out of bed. Paris stated that these symptoms were causing her to commit mistakes at work. R. 362. Paris indicated that the medication she was taking had been, for the most part, keeping her stable. R. 362. Paris denied psychotic or manic episodes, and stated that her "depression is suppressed when things are going well." R. 362. Upon examination, Dr. Rowell observed Paris to be oriented, with good insight, and intact judgment. R. 363. Dr. Rowell diagnosed Paris with mood disorder and a GAF score of 65, although he noted that the evaluation did not present a "clear picture" of her principal disorder. R. 363. Dr. Rowell recommended increasing her dosage of Wellbutrin and Klonopin.

Licensed clinical psychologist Angelia Berry, Psy.D. performed a consultative examination of Paris on March 28, 2009. R. 366–69. After examination and review of the review of her medical history, Ms. Berry diagnosed Paris with "major depressive disorder, recurrent, moderate," anxiety disorder NOS, and a GAF of 58. R. 369. Paris also reported that she had no problems with work relationships in the in the past. R. 369. Ms. Berry stated that Paris' reported symptoms that may "negatively impact her ability to maintain adequate attendance," but Ms. Berry found that these symptoms would not significantly impact Paris' comprehension or work performance. Ms. Berry further concluded that Paris was "likely capable of understanding direction, including simple and more detailed and complex directions." R. 369. Ms. Berry also

noted that Paris' ability to deal with daily stressors was "likely to be somewhat variable" and recommended resuming outpatient counseling. R. 369.

On May 5, 2009, Paris saw psychologist Maureen Guelzow, Ph.D. R. 380–83. Dr. Guelzow diagnosed Paris with "major depressive disorder, recurrent, severe," with panic disorder NOS, and a GAF score of 50. R. 380. Diagnostic tests based on self-reporting indicated severe depression and high levels of anxiety. R. 380–81. Dr. Guelzow noted that although Paris appeared depressed and anxious, Paris was cooperative, properly oriented, alert, with appropriate thought content, fair judgment, fair insight, and normal thought processes. R. 382. Paris reported severe short-term memory loss from her prior electroconvulsive therapy in 2005. R. 381–82. At a follow-up two weeks later, Dr. Guelzow noted Paris to have poor functioning. R. 379. In early June 2009, Dr. Guelzow found Paris' depression still severe. Paris missed her next appointment did not return to see Dr. Guelzow, despite a plan to continue counseling for at least a year. R. 377, 379.

State-agency examiner Richard Milan, Ph.D. reviewed Paris' existing medical history on October 30, 2009. R. 89–100. Dr. Milan noted that Paris would have some moderate limitations with things like following detailed instructions, maintaining concentration for extended periods, and maintaining regular attendance. R. 96–97. However, Dr. Milan concluded that the "[e]vidence indicat[ed] that the claimant is able to meet the basic mental demands of competitive work on a regular, ongoing basis despite the limitations arising from her impairment." R. 98.

Paris attempted suicide by overdose and was hospitalized and held on a temporary detention order in March 2010. R. 569–81. Paris stated at the time that she took Klonopin to overdose, although urine screens showed no benzodiazepines but were positive for amphetamines. R. 572. Paris was seen by Sarah Williams, M.D., who assessed a GAF of 40 prior

to treatment. Dr. Williams adjusted Paris' medication and told Paris to follow up on counseling before Paris was discharged home with a GAF of 60 after spending five days in St. Albans. R. 578.

On referral of Paris' attorney, licensed clinical psychologist Pamela S. Tessnear Ph.D. examined Paris on May 10, 2011 and produced a thorough report of her findings. R. 584–92. At that point Paris had not seen a mental health professional for at least a year. R. 584. Paris reported depression with crying spells, variable appetite, low energy, and sleep problems but little anxiety. R. 585–56. Paris stated that when working, she got along well with co-workers, supervisors, and the public but had problems with attendance because of her depression. R. 586. Dr. Tessnear diagnosed "major depressive disorder, recurrent, moderate," anxiety disorder NOS, personality disorder NOS (Cluster B), and a GAF score of 50–52. R. 591. Dr. Tessnear noted that although Paris claimed short-term memory loss, testing did not reveal memory impairment. R. 591. Dr. Tessnear concluded that it would be unlikely that Paris' symptoms would change much in the future and that Paris' prognosis is poor. R. 592. However, Dr. Tessnear opined that Paris was able to understand and follow simple instructions, and that she is able to get along with supervisors, co-workers, and the public, although she would perform best with minimal interpersonal contact. R. 592. Paris' pace and persistence during Dr. Tessnear's exam were good, although Dr. Tessnear noted that Paris' inability to deal with stress would interfere with her focus and concentration, causing work interruptions. R. 592. Dr. Tessnear recommended pursuing long-term counseling.

## II.  *Severity of Mental Impairments*

Paris essentially argues two reasons why substantial evidence does not support the ALJ's decision finding Paris not disabled because of her alleged mental impairments. First, Paris

alleges that the ALJ selectively relied on Paris' high GAF scores while ignoring her low GAF scores. Second, Paris claims that the ALJ erred in discrediting the subjective testimony of Paris and her husband. I address each argument in turn.

    a.  <u>GAF Scores</u>

In his opinion denying disability, the ALJ referenced Paris' GAF scores[2] from various doctors at different points during the relevant period: 65[3] at a psychiatric evaluation by Dr. Rowell in January 2009; 58[4] by Ms. Berry during her consultative evaluation in March 2009, 60 on discharge from the hospital after Paris' suicide attempt in March 2010, and 50[5] by Dr. Tessnear at a May 2011 consultative evaluation. R. 19–21. On appeal, Paris identifies other GAF scores—namely her scores upon hospital admission in February 2006, November 2008, and March 2010—that the ALJ did not reference in his decision and believes this to be reversible error. I find that it is not.

A GAF score "may reflect the severity of a patient's functioning or her impairment in functioning at the time the GAF score is given" but is merely snapshot in time, and "[w]ithout additional context, a GAF score is not meaningful." <u>Green v. Astrue</u>, CA 1:10-1840-SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011) (citing <u>Parker v. Astrue</u>, 664 F.Supp.2d 544, 557 (D.S.C.2009). GAF scores "may assist in the ALJ's determination of a claimant's residual functional capacity, but is not essential to such a determination." <u>Dawson v. Barnhart</u>, CIV.A.7:05CV00314, 2006 WL 982005, at *2 (W.D. Va. Apr. 11, 2006) (citations omitted). "[T]he failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a

_____

[2] The Global Assessment of Functioning is a numeric scale ranging from 0 to 100 used by mental health professionals to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Am. Psychiatric Ass'n 1994) ("DSM IV")

[3] A score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. <u>Id.</u>

[4] A score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning. <u>Id.</u>

[5] A score of 41–50 suggests serious symptoms or serious impairment in social or occupational functioning. <u>Id.</u>

disability determination. This is particularly true…where the ALJ fully evaluated the records and treatment notes upon which the GAF scores were based." Love v. Astrue, 3:11CV14-FDW-DSC, 2011 WL 4899989, at *5 (W.D.N.C. Sept. 6, 2011) (citations omitted).

Initially, I note that Paris' February 2006 hospitalization is well before the alleged onset date, and significant consideration of Paris' GAF scores from that time by the ALJ was not necessary. R. 454–46. As to Paris' scores when she was admitted to the hospital in November 2008 (GAF of 30) and March 2010 (GAF of 40), I find that the ALJ sufficiently evaluated the records surrounding the hospitalization, including the information upon which the scores would have been based.

With regard to Paris' November 2008 hospitalization, the ALJ noted that Paris was admitted to the hospital with "worsening of depressive symptoms and suicidal ideation." R. 19. Furthermore, the ALJ recognized that Paris was diagnosed with "severe recurrent major depressive disorder without psychosis" and that the hospitalization was roughly a week long. R. 19. The ALJ stated that "[n]otably," Paris' GAF score was 60 at discharge. When discussing Paris' March 2010 hospitalization, the ALJ noted that the admission was following a suicide attempt, and that Paris reported that she had taken an intentional overdose of Klonopin because "she [was] not getting disability." R. 20. The ALJ noted Paris' diagnosis of "recurrent major depressive disorder and unspecified personality disorder" and that Paris was transferred during the stay. The ALJ also considered Paris' March 2010 hospitalization elsewhere in the opinion. R. 17, 22.

While the ALJ did not explicitly mention Paris' GAF scored upon admission during these two hospitalizations, the ALJ did not ignore major symptoms, subjective complaints, or key diagnoses when evaluating the records from the hospitalization. The ALJ's reference to Paris'

GAF scores after hospitalization highlights her responsiveness to mental health treatment, something that she did not regularly seek despite repeated recommendations to do so. The GAF "snapshot" was but one of many bases on which the ALJ relied on in determining whether Paris' symptoms were as severe as she alleged. Review of each and every GAF score in the record was not essential. While a more fulsome evaluation of the records may be desirable, the ALJ did not commit reversible error. For these reasons, I find that the ALJ did not err in failing to reference these GAF scores and that remand is not proper on this ground.

    b.  <u>Credibility</u>

Paris argues that the ALJ erred by finding the testimony of Paris and her husband Fred Paris not credible. Specifically, she alleges that the ALJ relied on incorrect factual information regarding custody of Paris' grandson when discrediting their testimony. I find that although the ALJ may have relied on incorrect facts, any error that did occur is harmless.

At the administrative hearing, Paris testified that, as a result of her depression and treatment, she lost her short term memory, can no longer go in public places without difficulty, cannot get out of bed as many as three or four times a week, and cannot concentrate long enough to read a book. R. 36, 39–40. Similarly, Paris' husband stated that he often has to rouse Paris out of bed, that she sleeps 18 hours a day, and that she doesn't finish projects anymore. R. 51–53. In the ALJ's opinion, the ALJ found that Paris' testimony "concerning the intensity, persistence and limiting effects of [her depression] are not credible to the extent that they are inconsistent" with the RFC. R. 21. The ALJ also gave her husband's testimony "very limited weight as he was at best partially credible." R. 22. In discrediting the testimony of Paris and her husband, the ALJ relied in part on the fact that Paris fought for custody of her minor grandson and that Paris maintained custody of the child for a year in 2009 and 2010. R. 21–22.

Paris contends that the ALJ misstated the facts with regard to the custody situation, and as a result, erred in using Paris' custody situation as a basis for discrediting her and her husband's testimony. Paris points to a treatment note from November 2008 that suggests that Paris had given up custody of her grandson by the time of the alleged onset date. R. 436. However, the hearing testimony of Paris' husband suggests that Paris may have had custody over the grandson after the alleged onset date in 2009 and 2010, as the ALJ stated in the opinion. R. 57–59. Thus, at least to some extent, a factual ambiguity exists in the record. It is the duty of the ALJ to resolve factual conflicts in the record, and reviewing courts do not revisit inconsistent evidence on appeal. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The ALJ performed that duty here.

Even assuming *arguendo* that the ALJ was on the incorrect side of this factual ambiguity, I find that any error would be harmless because substantial evidence exists undermining Paris' and her husband's credibility, providing support to the ALJ's decision. Shields v. Colvin, 4:12-CV-00031, 2013 WL 3279273, *3 (W.D. Va. June 27, 2013) ("Notwithstanding such factual errors, the Commissioner's final decision adopting a Law Judge's findings will be affirmed if they are supported by substantial evidence."); Glaser v. Astrue, 2:11CV213, 2013 WL 1332064, at *13 (E.D. Va. Mar. 29, 2013) ("The Court finds, after discounting any misstatements or impermissible considerations raised by Plaintiff's Objections, that the ALJ's credibility determination is supported by substantial evidence.").

At the hearing Paris and her husband testified that Paris' depression caused extreme limitations, such as being bedridden for up to three or four days a week and having no short-term memory. Much of the medical evidence does not suggest that Paris is as functionally limited as suggested by this testimony. For example, none of the mental health experts who evaluated Paris

expressed that she is as disabled as she claims. State agency evaluator Dr. Milan determined that Paris could meet the basic mental demands of competitive work. R. 98. Dr. Tessnear, who Paris saw at the urging of her attorney, indicated that Paris would be able to get along with supervisors, co-workers, and the public, but that she would "do best in situations that require minimal interpersonal contact." R. 592. Moreover, despite reporting debilitating short-term memory loss, Dr. Tessnear's testing did not reveal any memory impairment. R. 591.

Significant gaps in Paris' mental health treatment history also exist in the record, including a period of at least one year. R. 584. When Paris was hospitalized during the relevant period, she was not under the active care of a psychologist or psychiatrist. In fact, after briefly seeing Dr. Guelzow in 2009, Paris never again pursued treatment from a psychologist or psychiatrist again despite recommendations to do so. R. 377, 379. Instead the only evidence from a treating doctor from that point forward came from treating physician Dr. Badillo, who noted that Paris' depression appeared stable in September 2010 (R. 493) and that her mood was normal the next month. R. 501.

This body of medical evidence undermines Paris' claims of disabling mental impairments, and was properly relied on by the ALJ to discredit Paris and her husband's testimony. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir.1984). As the record before the ALJ provides substantial evidence for discrediting the testimony of Paris and her husband, I decline to disturb the ALJ's credibility findings.

## III.    Listing

Next, Paris argues that the ALJ committed error in failing to find at step three that Paris did not meet or medically equal the requirements of Listing 12.04, dealing with affective disorders, or Listing 12.08, dealing with personality disorders. A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). To meet or equal Listing 12.04 or 12.08 for a mental disorder, a claimant must satisfy criteria under both paragraph "A" and "B" of the particular listing.[6] First, paragraph A delineates the required medical diagnostic or clinical evidence of a mental impairment. Second, paragraph B criteria for each § 12.00 listing requires a showing of at least two functional limitations, such as (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or, (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, §§ 12.04B & 12.08B. A "marked" limitation as required for Paragraph B "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id. §12.00C. Marked is more than moderate but less than extreme. Id.

In this case, the ALJ did not address the paragraph A criteria for the affective and personality disorders, and the Commissioner did not contest at oral argument that the paragraph A criteria were satisfied. As to paragraph B, the ALJ determined that the evidence established that Paris had moderate restrictions in activities of daily living; moderate difficulties in social

---

[6] Listing 12.04 also provides for alternative paragraph C criteria. However, Paris does not argue that these criteria apply to her claim and I likewise focus my analysis elsewhere.

functioning; moderate difficulties in concentration, persistence, or pace; and one episode of decompensation of extended duration. R. 17. Therefore, the ALJ found that neither the affective disorder nor personality disorder listing was met.

Substantial evidence supports the conclusion that Paris does not meet the paragraph B criteria to establish a listing under 12.04 or 12.08. Thus, there was no need for the ALJ to address the paragraph A criteria for the listing. As to the paragraph B criteria, the decision of whether Paris' limitations are moderate or marked is reserved to the ALJ; the claimant bears the burden of proof as to this point. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). The ALJ must clearly articulate the reasons for his decision regarding a listed impairment. Kiernan v. Astrue, 3:12CV459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013). "[A] conclusory statement that a condition does not constitute the medical equivalent of a listed impairment is insufficient." Id. (quoting Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009)). However, the fact"[t]hat the ALJ did not spell out every fathomable consideration is not reversible error." Smith v. Astrue, 2:11-CV-32, 2012 WL 1435661, at *6 (N.D.W. Va. Apr. 24, 2012) (citing Bledsoe v. Barnhart, 165 Fed. Appx. 408, 411 (6th Cir. 2006)). A cursory explanation at step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion. See Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir. 2011). Ultimately, the role of this court is to examine the record to determine if substantial evidence supports the ALJ's conclusion.

Paris specifically argues that two paragraph B criteria are met: marked restrictions in activities of daily living and marked difficulties in social functioning. Pl. Brief. Summ. J. 13–14. In her brief, Paris relies heavily on her subjective testimony regarding the severity of her impairments as to these criteria. As discussed at length above, the ALJ's decision finding Paris'

testimony not credible is supported by substantial evidence, and I decline to disturb the ALJ's decision with regard to credibility at this stage as well.

Setting aside Paris' subjective testimony, sufficient medical evidence supports the ALJ's decision that Paris did not meet her burden in establishing the paragraph B criteria. At oral argument, Paris conceded that no doctor stated in the record that Paris met the listing criteria. State agency psychologist Dr. Milan in October 2009 explicitly found that Paris did not meet any Paragraph B criteria. R. 94. Paris told both Ms. Berry and Dr. Tessnear that she did not have problems in her work relationships. R. 369, 586. Dr. Tessnear found that Paris would be able to get along with supervisors, co-workers, and the public, although she would perform best without much interaction. R. 592. Ms. Berry found that Paris' symptoms would not significantly impact Paris' work performance, although they might impact attendance. R. 369.

In light of the medical opinions and other evidence of record, I find that substantial evidence supports the ALJ's conclusion that Paris suffered from only moderate restrictions in activities in daily living and moderate difficulties in social functioning. A reasonable mind might accept the evidence of record as adequate to support the conclusions that Paris's activities of daily living and social functioning are not impaired to a degree that "interfere[s] seriously with [her] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1200(C) (defining a marked limitation). Therefore, I find that remand is not warranted on this ground.

## Physical Impairments

Paris next alleges that the ALJ's decision fails to sufficiently address the effect of her alleged physical impairments, either independently or cumulatively with her other impairments,

on her ability to work. I find that the ALJ's analysis and determination of Paris' physical conditions is supported by substantial evidence.

### I. Medical Evidence

With regard to Paris' physical impairments, the record reflects that during the relevant period Paris complained of back and shoulder pain to different medical providers, although it is unclear precisely what the source of that pain was. Paris saw Kristin Short, PA and Ralph Brown, M.D. in November 2008 for persistent back, shoulder, and neck pain. R. 300–302. Paris reported that the pain was primarily in her neck and low back, and that she denied being fatigued. R. 300. PA Short observed Paris' neck and back to be tender, but no swelling or tenderness in any extremity. R. 301. PA Short diagnosed myofascial pain syndrome and low Vitamin D. R. 301. Paris was prescribed Vitamin D and told to try and wean off Ambien. X-rays of Paris' cervical and thoracic spine from that time revealed signs of early degenerative disc disease and old granulomatous disease, but unremarkable vertebral body height, density, alignment, and paravertebral soft tissue. R. 304–305.

In December 2008, Paris saw rheumatologist Robert Johnson, M.D., who diagnosed Paris with Sjögren's syndrome, an autoimmune disorder causing dry eyes and mouth. R. 314. Paris reported mild pain in her neck, back, and arms that "comes and goes" and was exacerbated by standing. R. 315. Dr. Johnson's physical examination found Paris generally healthy with normal range of motion in her fingers, wrists, elbows, and shoulders. R. 315–16. Also in December 2008, Paris saw her primary care physician Leslie Badillo, M.D. R. 317. Although the primary reason for the visit was to discuss Paris' depression, Dr. Badillo diagnosed fibromyalgia and myofascial pain. R. 318. Paris followed up with PA Short on May 7, 2009 and reported continued right shoulder pain. R. 469–71. PA Short found tenderness in Paris' neck, back, and

right shoulder. R. 470. PA Short recommended switching pain medication and flector patches for Paris' right shoulder. R. 471.

Paris returned to rheumatologist Dr. Johnson in July 2009 and complained of continued right shoulder pain and weakness. R. 389–93. Dr. Johnson's exam revealed normal motion and no swelling in Paris' shoulder, but he assessed arthralgias and shoulder periarthritis. R. 392. Furthermore, Dr. Johnson found mild decrease in the range of motion of Paris' cervical spine, and normal alignment and no tenderness in Paris' thoracic and lumbosacral spine. R. 392. Dr. Johnson also found no swelling and normal motion in Paris' hips, knees, ankles, and feet. R. 393. Dr. Johnson discussed physical therapy and steroid injections for Paris' shoulder, although it does not appear that she pursued this treatment. R. 389.

State agency physician Michael Hartman, M.D. reviewed Paris' medical history in April 2009, and determined that Paris could occasionally lift and/or carry 50 pounds; frequently lift/carry 25 pounds; and sit, stand, or walk for about 6 hours in an 8-hour workday. R. 82–83. A second state agency physician, Richard Surrusco, M.D. made similar findings regarding Paris' physical limitations in October 2009. R. 95–96.

## II.    *Substantial Evidence/Combination of Impairments*

Paris argues that the ALJ insufficiently considered the impact of her alleged physical impairments on her ability to work, both independently and combined with the symptoms of her alleged mental impairments. The ALJ, in his denial of benefits, determined that Paris had the severe physical impairments of Sjögren's syndrome, obesity, myofascial pain syndrome/fibromyalgia, and hyperthyroidism. R. 16. After reviewing the above evidence regarding Paris' physical conditions, the ALJ concluded that Paris retained the ability to perform work at the medium level of exertion. R. 18–21. I find that substantial evidence supports the

ALJ's decision as to Paris' physical restrictions, and find that the ALJ did not commit error in considering the combined impact of the physical and mental restrictions.

Tellingly, at oral argument counsel for Paris conceded that Paris' primary alleged impairments were mental, and that a distinction between medium and light level exertional work was not significant. I agree. Substantial evidence supports a RFC of medium work. Although the medical records document some history of pain and other physical symptoms, objective testing from treating doctors does not establish any disabling condition. No treating physician opinion as to physical disability exists in the record, and the opinion of both state agency evaluators supports the physical limitations in the RFC.

Paris also alleges that the ALJ's opinion is deficient because it fails to evaluate the combined severity of Paris' alleged physical and mental impairments. The regulations and Fourth Circuit cases make clear that where a claimant has multiple impairments, the ALJ must consider the combined effect of those impairments in determining whether the claimant is disabled. 20 C.F.R. § 416.923; Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). "It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render [a] claimant unable to engage in substantial gainful activity." Id. at 50. In addition to "not fragmentiz[ing]" the effect of the claimant's impairments, "the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id. at 50 (citing Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir.1985)). "The ALJ's duty to consider the combined effect of Plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue 'throughout the disability process.'" Mazyck v. Astrue, CA 8:10-2780-TMC, 2012 WL 315648, at *2 (D.S.C. Feb. 1, 2012) (citing 20 C.F.R. § 404.1523).

"[A]n ALJ need not explicitly state that he or she has considered a claimant's impairments in combination. What matters is whether it is discernible from the ALJ's decision that he or she did so." <u>Jones v. Astrue</u>, 7:10CV00313, 2011 WL 1877677, at *12 (W.D. Va. May 17, 2011). Here, the ALJ explicitly found that Paris did "not have an impairment or combination of impairments" that met or medically equaled a listed impairment considered, which included both physical and mental listings. R. 17. Moreover, the ALJ's written opinion reveals that he thoroughly considered all of the evidence relating to Paris' alleged physical and mental impairments when developing an RFC and finding Paris not disabled. It is apparent from the RFC itself that the ALJ accounted for the cumulative impact of Paris' impairments as supported in the record, providing restrictions that are both mental and physical. R. 18. Indeed, in his step four analysis, the ALJ addresses Paris' alleged physical limitations and mental limitations in separate paragraphs. However, the ALJ's review of the medical evidence consisted of an integrated chronology, reviewing evidence of both physical and mental impairments. R. 18–20. Moreover, "[s]ufficient consideration of the combined effects of a plaintiff's impairments is shown when each is separately discussed in the ALJ's decision, including discussion of a plaintiff's complaints of pain and level of daily activities." <u>Baldwin v. Barnhart</u>, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005). The ALJ's analysis is sufficient on this front, and accordingly, I find that the ALJ did not fail to analyze the combined effect of Paris' alleged impairments, both mental and physical.

## **<u>CONCLUSION</u>**

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case

from the court's docket.

     The Clerk is directed to transmit the record in this case to Samuel G. Wilson, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

     Enter: January 24, 2014

     *Robert S. Ballou*

     Robert S. Ballou
     United States Magistrate Judge